491 So.2d 116 (1986)
Lorenzo CHANCE, Plaintiff-Appellee,
v.
STEVENS OF LEESVILLE, INC., Defendant-Appellee, and
Winston Homes, Inc., Defendant-Appellant.
No. 85-695.
Court of Appeal of Louisiana, Third Circuit.
June 25, 1986.
Rehearing Denied July 24, 1986.
Writ Denied October 17, 1986.
*117 Watson, Murchison, Steven D. Crews, Natchitoches, for defendant-appellant.
Edward Chevallier of Burkett and Chevallier, Many, for plaintiff-appellee.
Edwin Cabra of Cabra and Leach, Leesville, for defendant-appellee.
Before STOKER and YELVERTON, JJ., and BERTRAND, J. Pro Tem.[*]
YELVERTON, Judge.
The plaintiff, Lorenzo Chance, filed this redhibition suit against Stevens of Leesville, Inc., the seller, and Winston Industries, Inc., the manufacturer, for the return of the price paid for a mobile home. He also sought damages and attorney's fees. Winston Industries was later dismissed from the suit when it was discharged in bankruptcy. Defendant Stevens answered generally denying any fault on its part, and filed a third party demand against Winston Homes, Inc. alleging Winston Homes to be the bankrupt manufacturer's successor and obligor on all obligations and warranties of Winston Industries. Plaintiff amended to name Winston Homes a party defendant. Winston Homes filed a cross-claim against Stevens. After trial a judgment was rendered for the plaintiff against Winston Homes for $27,234.94, representing the payoff value of the mobile home, plus $9.92 per day interest on that sum from February 22,1985, as well as damages in the sum of $15,000, attorney's fees in the amount of $5,000, and judicial interest. The trial court rejected plaintiff's claim against Stevens as well as the cross claim of Winston Homes against Stevens. From these judgments the defendant, Winston Homes, has appealed.
The plaintiff answered the appeal of Winston Homes and asked for an increase in the awards, and in this answer he asked for a judgment against Stevens. Plaintiff did not appeal the rejection of his demand against Stevens.

Facts
Winston Industries, the manufacturer, delivered the mobile home to the dealer, Stevens, in the summer of 1982. Subsequently Winston Industries filed a petition in the United States Bankruptcy Court in Cleveland, Ohio. The trustee in bankruptcy sold substantially all of the assets of Winston Industries to a Mr. Don Tidwell, who immediately created Winston Homes, Inc., and conveyed the assets to that company. These sales occurred in January 1983. Under the terms of the bankruptcy sale the buyer or his assigns assumed certain warranty liabilities of the former company. The assumed liability was expressed simply as a dollar amount, without reference to any particular warranty claim or any particular item manufactured by the bankrupt, presumably meaning that Winston Homes assumed warranty liability on a "first come, first served" claim basis, up to the limit of its dollar assumption and no more. On October 18, 1983, the bankruptcy court issued an order releasing and discharging the purchaser and his assigns from any further obligations after determining that the purchaser had satisfied in *118 full all of his assumed liabilities under the sale.
Some four months before this discharge, on June 22, 1983, Stevens sold the mobile home to the plaintiff, Lorenzo Chance. At the time of sale Stevens provided Chance with the standard written warranty that had come with the mobile home from Winston Industries.
On July 16, 1983, three and a half weeks after the purchase of the home, plaintiff fell through the floor. He immediately contacted Stevens for repairs. Upon inspection Stevens' serviceman found water damage to the floor. Stevens then contacted Winston Homes about the problem. Although Winston Homes scheduled a serviceman to repair the floor, the repairs were never accomplished. After discovery of the extent of the water damage and of numerous other problems with the trailer, the plaintiff filed this suit on December 8, 1983, for rescission of the sale based on redhibition.
Trial on the merits lasted four days. In its written reasons for judgment the trial court found that the mobile home was defective and that the defects rendered its use so inconvenient that the buyer would not have purchased it had he known of the vices. It held Stevens not liable on a finding that Stevens had no knowledge of the defects. The court found that Winston Homes assured Stevens it would meet all warranty obligations of the manufacturer, Winston Industries. Based on that finding, the trial court held that Winston Homes took over the warranty obligations of the manufacturer and awarded plaintiff a judgment.

Issues
The issues presented by defendant's appeal are:
1) Whether the trial court erred in finding the defects were redhibitory;
2) Whether the trial court erred in finding that Winston Homes had taken over the warranty obligations upon this mobile home;
3) Whether the trial court erred in its award of damages and attorney's fees; and
4) Whether the trial court erred in failing to find Stevens responsible for any portion of the damages.
Winston Homes has also questioned a ruling of the trial court regarding the expertise of a witness in the field of bankruptcy. Because we find that the laws of bankruptcy are not applicable to the outcome of this case, it is not necessary to address this particular assignment of error.
The plaintiff in his answer to the appeal is seeking an increase in the award of damages, as well as attorney's fees.

Redhibition
In Moses v. Ed's Manufactured Housing, Inc., 470 So.2d 935 (La.App. 3rd Cir. 1985), this circuit was presented with a similar redhibition suit against the seller and manufacturer of a mobile home. Finding that the trial court was not clearly wrong in its determination that the defects were redhibitory, this court stated:
"The defendant-appellant, Eagle, has assigned seventeen errors to the judgment of the trial court finding the defects complained of to be redhibitory. We do not think that the trial court was clearly wrong in its factual findings regarding the nature and severity of the roof and plumbing leaks and their redhibitory nature. The trial court found that the defects existed at the time of the sale, and that they were not readily apparent:
"The principles of law applicable to redhibitory actions generally and applicable to the case before us specifically were summarized in Rey v. Cuccia, 298 So.2d 840 (La.1974):
"`In Louisiana sales, the seller is bound by an implied warranty that the thing sold is free of hidden defects and is reasonably fit for the product's intended use. Civil Code Articles 2475, 2476, 2520; Media Production Consultants, Inc. v. Mercedes-Benz of North America, Inc., 262 La. 80, 262 So.2d 377 (1972). The seller, of course, can limit this warranty by declaring to *119 the buyer the hidden defects at the time of the sale, Article 2522, or can otherwise limit his obligations as seller, providing he do so clearly and unambiguously, Article 2474.
"`A redhibitory defect entitling the buyer to annual the sale is some defect in the manufacture or design of a thing sold "which renders it either absolutely useless, or its use so inconvenient and imperfect, that it must be supposed that the buyer would not have purchased it, had he known of the vice." Article 2520. Upon proof of such a defect, the buyer is entitled to annul the sale and recover the purchase price, rather than being limited to recovering the cost of curing any such substantial defects. Prince v. Paretti Pontiac Company, Inc., 281 So.2d 112 (La.1973).
"`The buyer must prove that the defect existed before the sale was made to him. Article 2530. However, if he proves that the product produced is not reasonably fit for its intended use, it is sufficient that he prove that the object is thus defective, without his being required to prove the exact or underlying cause for its malfunction. J.B. Beaird Co. v. Burris Bros., 216 La. 655, 44 So.2d 693 (1949); Crawford v. Abbott Automobile Co., Ltd., 157 La. 59, 101 So. 871 (1924); Stumpf v. Metairie Motor Sales, Inc., 212 So.2d 705 (La.App. 4th Cir.1968); Fisher v. City Sales and Service, 128 So.2d 790 (La.App. 3d Cir.1961).
"`The buyer may prove the existence of redhibitory defects at the time of the sale not only by direct evidence of eyewitnesses, but also by circumstantial evidence giving rise to the reasonable inference that the defect existed at the time of the sale. Fisher v. City Sales and Service, 128 So.2d 790 (La.App. 3d Cir.1961); Mattes v. Heintz, 69 So.2d 924 (La.App.Orl.1954); Standard Motor Car Co. v. St. Amant, 18 La.App. 298, 134 So. 279 (La. App. 1st Cir.1931). As stated in Jordan v. Travelers Insurance Co., 257 La. 995, 245 So.2d 151, 155; "* * * proof by direct or circumstantial evidence is sufficient to constitute a preponderance when, taking the evidence as a whole, such proof shows the fact or causation sought to be proved is more probable than not."
"`If the defect appears within three days following the sale, it is presumed to have existed before the sale. Article 2537. However, even where the defect appears more than three days after the sale (as here, when it appeared on the second day of use, but ten days after the sale), if it appears soon after the thing is put into use, a reasonable inference may arise, in the absence of other explanation or intervening cause shown, that the defect existed at the time of the sale. Andries v. Nelson, 46 So.2d 333 (La.App. 1st Cir.1950); Standard Motor Car Co. v. St. Amant, 18 La.App. 298, 134 So. 279 (La.App. 1st Cir.1931). See, for similar principle, when a constructed thing fails shortly after being put into use. Joyner v. Aetna Casualty & Surety Co., 259 La. 660, 251 So.2d 166 (1971).' Ticheli v. Silmon, 304 So.2d 792 (La.App. 2 Cir.1974).
"The defendant's witnesses testified that the roof leaked because of faulty installation process used by Eagle at the time the home was manufactured, so clearly that defect existed prior to the sale. Defendant contends that this defect is easily cured and, therefore, not redhibitory. Unfortunately, the defect and the means to repair it were not discovered until substantial damage and inconvenience had been caused to the plaintiff. We do not feel that the curability of the defect at such a late date renders the plaintiff's action null. The trial court also found that the evidence supported the reasonable conclusion that the plumbing leak existed prior to the sale and was redhibitory. The evidence is overwhelming that this home was plagued by leaks prior to its purchase by plaintiff and subsequent to its purchase and habitation *120 by plaintiff. We agree with the trial court that these defects, and in addition, the existence of multiple other problems, were of such a nature and so severe that it was rendered so inconvenient and imperfect that the plaintiff would not have purchased the home had he known of them. We therefore agree that plaintiff was entitled to return of the purchase price, plus attorney's fees."
In the present case there was extensive testimony of multiple defects.
Mrs. Chance testified that when she and her husband inspected the home before purchase none of the major problems were apparent. When Stevens delivered the home an excess amount of water was discovered in the symplex underneath the trailer. The serviceman had to cut a hose to remove the water. Also, after Stevens set up the home, she noticed that the doors would not close properly and that a window was crooked. She then began to find numerous other minor problems including holes in a sink, a loose shower spout, an improper fitting closet door, misplaced door stops, a blown off toilet hose, a slow draining shower, a cut floor in the kitchen, torn wallpaper, and a missing piece of molding. Stevens came out to repair some of these problems but never finished. On July 16, 1983, her husband walked in the back door and fell through the floor. This was three weeks and two days after the sale. After Stevens was told of this, Greg McKee, a serviceman, came to repair the floor. McKee's inspection of the floor revealed extensive water damage. He told Mrs. Chance that the problem was beyond what Stevens was able to do and that Stevens would have to call the factory to repair the problem.
Lorenzo Chance also testified that when the serviceman from Stevens came to repair the floor, the serviceman told them that the problem was beyond Stevens' expertise, and that they could not repair it. It was then that Winston Homes sent a serviceman to inspect the floor. In July 1983 Winston Homes set up a date for its serviceman to repair the floor, but the serviceman did not show up on the scheduled date. Again in August the serviceman never came when a repair time was rescheduled. At this point Chance asked his attorney to rescind the sale.
In Chance's testimony he explained a dispute that he had with Winston Homes. He said they only wanted to replace the floor up to the walls, while he wanted the floor replaced underneath the walls also. He said that Stevens never came back to repair the minor problems, and that he continued discovering additional ones.
In October 1984 at the request of Stevens Mr. Rick Hayes, an inspector with the State Fire Marshall's Office in the mobile home division, inspected the home. His testimony and inspection revealed a number of problems. The particle board flooring around the commode was deteriorating due to water damage. The sliding storm window would not lock properly. The linoleum floor in one of the bedrooms had a two and one-half inch cut place. Some molding was found coming loose. The light fixture above the kitchen sink had a one-quarter to one-half inch gap. The storm door was not sealed with putty tape. Light from the outside could be seen from the inside when the door was closed. The particle board flooring near the door was deteriorating due to water damage. The flooring had water stains and mildew spots 17 feet long and three to four feet wide. In the hall, the furnace was not secured to the floor, the furnace compartment had a hole in it five inches in diameter, and the area was not properly firestopped. In the middle bedroom the flooring had mildew spots and water stains three feet long and 18 inches wide, the floor had buckled up one-half inch, and the ceiling tile had not been secured properly. In the utility area he discovered a hole in the floor 15 inches in diameter, water damage to the floor in an area nine feet by four feet, and water stains on the paneling beside the back door. The rear storm door was also not properly installed. He could see light from the outside when the door was closed. There was also no putty tape sealing this door. In the *121 rear bathroom the switch on the fan was not working. In the rear bedroom the area around the hot water heater was not waterproofed.
Upon inspecting the outside of the mobile home Mr. Hayes noticed additional problems. Some metal siding was coming loose, the flooring between the bottom plate and the edge rail was deteriorating, the metal top had no cool seal, the 15 amp breaker above the lighting circuit was not wired up, and there were no GFI breaker or GFI "receps" installed in this home. Also, the electrical system could cause an overload since 10 to 21 lights were running off one 15 amp breaker. The major problem with the home was the water damage evidently caused by leaking.
The plaintiff also called a carpenter and a contractor to testify. Jessie Nolan, a carpenter, testified that he inspected the mobile home three and a half weeks after the purchase and discovered considerable water damage throughout. He also noticed signs of water damage around the studs. In his opinion the flooring needed a complete replacement. All rugs, carpets and damaged paneling also needed replacement. He estimated that it would have taken eight months for this amount of damage to develop.
Warren Founds, a contractor, found that the particle board flooring was deteriorating due to water damage. He explained that when particle board gets wet the glue dissolves causing the board to come apart. For this to occur the flooring would have to be wet for quite some time. To repair the home would require the replacement of the carpet, and the replacement of toe plates and damaged paneling, as well as the replacement of the flooring. Mr. Founds also stated that the doors needed to be fixed to stop the leaking.
Mr. Julien Stevens, the seller's president, testified that the water was leaking in from either the doors or down the walls and that he did not think the damage to the floors could have occurred within a three week period. When the home was delivered to Stevens from the factory, the home did not have conventional mobile home door units. The doors on the home were ineffective because they did not have sealing capabilities. Storm doors had to be added.
Julien Stevens, III, former salesman of Stevens, testified that he never noticed any problems with the flooring of the home while it sat on the lot.
James McKee, a serviceman for Stevens, testified that he was sent to repair the hole in the floor in July 1983. In order to repair the floor Mr. McKee removed the floor near the hole. Upon removal, he discovered that the floor was rotten under the interfacing of the door and the floor was swollen underneath the walls. Plaintiff had originally agreed to a replacement of the damaged floor up to the wall but when he discovered that the floor was also swollen under the walls, he wanted the entire floor replaced. At that time Mr. McKee told the plaintiff that Stevens had no experience or equipment to raise the walls and put new floor under it.
Julien Stevens, III, and a repairman for Winston Homes testified that the damage could be repaired by merely replacing the damaged floor up to the walls, and that it was not necessary to replace the damaged board under the walls.
Applying the principles announced in Moses, supra, the evidence is overwhelming that the trial court was not clearly wrong in finding that the major defects existed at the time of sale, that they were not readily apparent, and that the nature and severity of the problems rendered the mobile home so inconvenient and imperfect that the plaintiff would not have purchased the home had he known of them.
It is clear from the evidence that the water damage to the floors was caused by leaks around the doors or from leaks from within the walls, or both. The testimony was that such damage would have begun to occur months before the sale. The plaintiff, his wife and the employees of Stevens testified that the structural damage to the floors was not apparent before the sale. It is also clear that the electrical problems as well as many of the minor problems also *122 existed prior to the sale and were not readily apparent. The appellant contends that the damage to the floors could be easily cured by replacing the floor to the wall, and that this therefore was not redhibitory. Unfortunately, the water damage to the flooring extended underneath the walls of the mobile home and some of defendants' witnesses testified that it would be virtually impossible to replace the affected particle board underneath the walls. Plaintiff's expert witnesses testified that all damaged board needed to be replaced. The evidence also tended to show that the leaking might have been within the walls, requiring possibly extensive repair work there. For these reasons, we agree with the trial court that plaintiff was entitled to a rescission of the sale and the return of his purchase price. The Warranty Obligations of Winston Homes
Winston Homes contends that the trial court erred in finding that it had taken over the manufacturer's warranty obligations upon the Chances' trailer. It argues that when it purchased the assets of Winston Industries it assumed only a limited amount of warranty obligations under the sale, and that the bankruptcy court order in October 1983 discharged and released it from any further warranty obligations assumed under the sale.
Although Winston Homes may not have been legally required to assume the manufacturer's warranty obligations on the Chances' mobile home under the terms of the bankruptcy sale, the evidence is clear that Winston Homes in fact undertook such obligations and responsibilities.
C.C. art. 2295 states as follows:
"Art. 2295. When a man undertakes, of his own accord, to manage the affairs of another, whether the owner be acquainted with the undertaking or ignorant of it, the person assuming the agency contracts the tacit engagement to continue it and to complete it, until the owner shall be in a condition to attend to it himself; he assumes also the payment of the expenses attending the business.
"He incurs all the obligations which would result from an express agency with which he might have been invested by the proprietors."
Julien Stevens testified that Winston Homes assured him that it would continue to do the service and warranty work on homes manufactured by Winston Industries. Winston Homes specifically stated that it was willing to do the repair work needed on the Chances' mobile home. Terry Stewart, an employee of Winston Homes, testified that the company continued to honor all warranty work on homes manufactured by Winston Industries. Larry Brewer, the director of consumer relations for Winston Homes, stated that the company met its warranty obligations under the bankruptcy sale in mid-1983, but that it continued to do some warranty work on Winston Industries's mobile homes after that date as a good will measure. Representatives for Winston Homes indicated to both the Chances and Stevens that they would perform the warranty work needed on this mobile home.
In the present case we find that Winston Homes did undertake, on its own accord, the warranty obligations of Winston Industries upon the mobile home of the Chances. Such action created a quasi contract between Winston Homes, Stevens and the Chances. Therefore, under C.C. art. 2295, Winston Homes is responsible for all the obligations owed the Chances and Stevens under the terms of the warranty including the implied warranty of fitness. See C.C. arts. 2475, 2476, 2520 and 2531.
Accordingly, we find that Winston Homes is liable for the purchase price and the reasonable expenses occasioned by the sale, subject to the credit awarded for the use of the mobile home by the Chances. C.C. art. 2531.
The financing documents show that the Chances made a downpayment of $1,522.40. They also paid $7,592.63 in mortgage payments and finance charges after the purchase. The payoff of the note at the time of trial was $27,111.55 according to the testimony of Mr. Chance. The interest on the note was $9.92 per day from the date of the trial. The amount financed included setup charges, sales tax, and license, *123 registration, and certificate of title fees. These items were reasonable expenses occasioned by the sale. We find that the defendant, Winston Homes, is liable for these amounts and legal interest, subject to a credit for use.
The Chances lived in the mobile home from the date of purchase to the time of trial, about 20 months. However, the trailer was plagued with numerous problems during this time. Although several of defendants' witnesses testified a trailer like this could rent for as much as $300 a month, due to the numerous problems we will award a credit of only $100 a month, or $2,000. Therefore we find Winston Homes liable for the sum of $34,226.58, plus $9.92 per day until paid from February 22, 1985, and legal interest from date of judicial demand.

Damages and Attorney's Fees
Appellant contends that the trial court erred in its award of damages and attorney's fees. Winston Homes argues that since it did not manufacture the mobile home, it should not be presumed to know of the defects and therefore, an award of damages and attorney's fees is improper. We agree for different reasons.
Under C.C. art. 2298 the circumstances surrounding the undertaking of another's obligations may authorize the mitigation of damages by the court. In the present case it appears that Winston Homes undertook the warranty obligations upon the Chance's mobile home as a good-will measure.
We find an award of damages and attorney's fees improper under the circumstances of this case and therefore mitigate the award not to include them.

The Liability of Stevens
Winston Homes third partied Stevens, and complains that the court erred in failing to find Stevens liable for a portion or all of the damages. The trial court found that the defects were not caused by any negligence on the part of Stevens, and that Stevens was not aware of the defects before the sale. The trial court was not clearly wrong in these factual determinations. For this reason we do not find that Winston Homes is entitled to indemnification from Stevens.
Winston Homes also argues that Stevens under the written warranty contract had primary responsibility for repairing the mobile home. It argues that Stevens was capable of repairing the defects and that it breached its duty under the contract by failing to do so.
The evidence was clear, however, that Stevens was incapable of doing repairs as extensive as required here. The floor repairs required factory facilities and equipment. Also, Julien Stevens and Alexison Ellis, Stevens' service manager, testified that Stevens did not do the repair work because it had never been authorized to do so by the factory (Winston Homes), and that the factory told Stevens that it would handle the repairs.
Under these facts we find that Stevens did not owe a duty to Winston Homes to make repairs under the warranty contract. The factory instructed Stevens not to repair the home; if Stevens had done the repairs without the factory's authorization, it would have met resistence being reimbursed. For these reasons we find that the trial court did not err in denying Winston Homes' third party demand against Stevens.
Because of our prior discussion of damages and attorney's fees we need not address the damage issues raised by plaintiff's answer to the appeal.
In his answer to the Winston Homes appeal, plaintiff asks us to review the judgment rejecting his demand against Stevens. Only Winston Homes took an appeal. Neither Stevens nor the plaintiff is an appellant. Plaintiff merely answered the appeal perfected by Winston Homes.
Under the provisions of La.-C.C.P. art. 2133 and the jurisprudence interpreting those provisions, the plaintiff's answer can afford him appellate relief only with respect to the judgment rendered against Winston Homes, and then only to the portion plaintiff complains of; it cannot afford him relief against Stevens because Stevens is not an appellant. See Horne v. Liberty Furniture Co., 452 So.2d 204 (La.App. 5th *124 Cir.1984), writ denied, 456 So.2d 166, 171 (La.1984).
Therefore, we cannot give plaintiff any relief from the trial court's dismissal of his claim against Stevens. That judgment has now become final.
For the above reasons the judgment of the trial court is amended to award judgment in favor of plaintiff, Lorenzo Chance, and against the defendant, Winston Homes, Inc., in the sum of $34,226.58, and legal interest from date of judicial demand, plus $9.92 per day from February 22, 1985, until the sum is paid in full. All costs are assessed against Winston Homes, Inc.
AMENDED AND AS AMENDED, AFFIRMED.
STOKER, J., dissents and assigns written reasons.
STOKER, Judge, dissenting.
I respectfully dissent. I disagree that LSA-C.C. art. 2295 applies as the majority has applied it in this case.
NOTES
[*] Judge Lucien C. Bertrand, Jr. of the Fifteenth Judicial District Court participated in this decision by appointment of the Louisiana Supreme Court as Judge Pro Tempore.